**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Darry D. Neff, a/k/a Darry Dean | ) | |
| Neff, Beverly Ann Neff, a/k/a | ) | |
| Beverly Neff, Wilbert Neff, | ) | |
| Ida Neff, individually and as Personal | ) | Case No. 4:05-cv-128 |
| Representative of the Estate of Arthur Neff; | ) | |
| Smith Bakke Hovland & Oppegard, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is an Application for Surplus Proceeds filed by the Government, a Motion for Disbursement of Funds filed by Defendant Smith Bakke Hovland & Oppegard[1] (Smith), and a Motion for Disbursement of Funds as well as a Claim of Homestead Exemption filed by Defendant Wilbert Neff (Neff). Judge Conmy has referred this matter to the undersigned for preliminary consideration.

For the reasons set forth below, the undersigned recommends: that the surplus proceeds attributable to the sale of Lot 4 ($21,926.92) be paid to Smith and the balance of the surplus proceeds ($79,727.79) be paid to Neff.

---

[1] Now known as Smith Bakke Porsborg & Schweigert.

## I.   BACKGROUND

The Government initiated the above-entitled foreclosure action by complaint on December 8, 2005, the basis being that Defendants Darry, Beverly, and Wilbert Neff had defaulted on promissory notes held by the Farm Services Agency (FSA), formerly known as the Farmers Home Administration (FmHA).  These notes were secured either by mortgages on real estate ("the real estate debt")  or security interests in crops and chattels located in Sheridan County ("the chattel debt").

Smith was named as a defendant because it had obtained a judgment against Neff on September 28, 1999, in Burleigh County District Court (Case No. 8-99-C-1869) in the amount of $11,928.73 with interest accruing at the rate of 12% or $3.92 per day.  On May 28, 2002, the judgment was transcribed to Sheridan County District Court (Case No. 42-02-1002).  The Clerk of Court for Burleigh County issued a writ of execution on October 6, 2006, which was filed with this Court on October 10, 2006. (Docket No. 41).  The Court entered judgment in the Government's favor on June 30, 2006,[2]  and ordered a sale of the real and chattel property.

---

[2]  The judgement stated in relevant part:

Judgment shall be entered against defendants Darry Neff, and Beverly Neff on the promissory note dated January 18, 1990, in the original principal amount of $69,804.38, principal in the sum of $69,804.38, and interest to date of June 22, 2006, of $99,768.11; on the promissory note dated January 18, 1990, in the original principal amount of $10,062.44, principal in the sum of $10,062.44, and interest to date of June 22,2006, of $13,063.25; on the promissory note dated January 18, 1990, in the original principal amount of $9,056.24, principal in the sum of $13,212.46, and interest to date of June 22, 2006, of $2,109.64; on the promissory note dated January 18, 1990, in the original principal amount of $7,457.99, principal in the sum of $7,833.86, and interest to date of June 22, 2006, of $5,721.75; and under the promissory notes and chattel and crop security agreements, there is now due and owing, on the promissory note dated January 18, 1990, in the original principal amount of $55,565.40, principal in the sum of $55,565.40, and interest to date of June 22, 2006, of $31,760.82; and for sums advanced for protective advances due and payable under the terms of the loan documents that have been paid out to cover payment of filing fees, principal in the sum of $20.00 and interest to June 22, 2006, of $.59; together with costs and disbursements of this action amounting to $384.00 (the court cost of $350.00 is joint and several with defendant Wilbert Neff), making a total of $309,306.70, as of June 22, 2006, plus prejudgment interest which accrues at a daily rate of $28.76 until the date

The court broke the real property down into six separate lots for sale.[3]  Wilbert Neff owned Lots 5 and 6, as well as a one-half interest in Lot 4.  The record reflects that he was purchasing the real property constituting Lots 5 and 6 pursuant to a contract for deed with his parents, Arthur and Ida Neff, that was entered into in 1975 and before the property was mortgaged to the Government in 1977.

The United States Marshal auctioned off all six lots and the chattel property on August 23, 2006.  All six lots were sold separately.  Lot 1 sold for $135,000.  Lot 2 sold for $27,000.  Lot 3 sold for $32,000.  Lot 4 sold for $55,000.  Lot 5 sold for $90,000.  Lot 6 sold for $10,000.  The sale of Wilbert Neff's real property netted a surplus of $101,654.71, but the sale of his chattel property

---

of entry of judgment, with interest accruing after entry of judgment at the legal rate until paid in full.

Judgment shall be entered against defendant Wilbert Neff on the promissory note dated January 18, 1990, in the original principal amount of $29,968.62, principal in the sum of $17,864.38, and interest to the date of June 22, 2006, of $6,527.36; and under the promissory notes and chattel and crop security agreements, there is now due and owing, on the promissory note dated January 18, 1990, in the original principal amount of $57,755.27, principal in the sum of $53,965.55, and interest to date of June 22, 2006, of $13,624.37; and for sums advanced for protective advances due and payable under the terms of the loan documents that have been paid out to cover payment of filing fees and an appraisal, principal in the sum of $670.00, and interest to June 22, 2006, of $17.40; together with costs and disbursements of this action amounting to $368.00 (the court cost of $350.00 is joint and several with defendants Darry D. Neff, and Beverly A. Neff), making a total of $93,037.06, as of June 22, 2006, plus prejudgment interest which accrues at a daily rate of $12.19 until the date of entry of judgment, with interest accruing after entry of judgment at the legal rate until paid in full.

[3] The real property was broken into the following  six lots all of which are located in Township 148 North, Range 77 West, Sheridan County:
Lot No. 1:
            Section 25: W1/2
Lot No. 2:
            Section 30: Lot 2, SE1/4NW1/4
Lot No. 3:
            Section 31: NE1/4
Lot No. 4:
            Section 23: SE1/4SE1/4
            Section 26: SE1/4
Lot No. 5
            Section 30: NE1/4NW1/4, NE1/4
Lot No. 6
            Section 29: NW1/4NW1/4

resulted in a deficiency on the chattel debt in the amount of $52,974.25.  When Wilburt Neff's chattel loans were made, the Government did not secure them with a second mortgage or otherwise cross-collateralize the chattel debt to the real estate.

On September 25, 2006, Wilbert Neff filed an Application for Refund of Surplus Sale Proceeds.  On October 20, 2006, Neff filed an amended Application for Refund of Surplus Sale Proceeds and a Notice of Homestead Exemption.  On September 26, 2006, the Government filed an Application for Surplus Proceeds from the sale of Wilbert Neff's real property.  On October 2, 2006, Smith filed an Application for Surplus Proceeds.  On October 6, 2006, Smith filed an amended application.  A hearing was held on November 15, 2006, and post-hearing briefs have been submitted by all the parties.

II.    DISCUSSION

A.    The claims generally

Three claims exist against the $101,654.71 in surplus proceeds on deposit with the court. Wilbert Neff claims a homestead exemption up to the maximum allowed by North Dakota law, which is $80,000.  The claim of the United States is for the judgment amount still owed on the chattel debt after sale of the chattel security, which is now $52,974.25, plus interest accruing at a rate of 5.24 percent or $7.61 per day.[4]  Smith's claim is based upon a 1999 judgment, and is for

---

[4]  $52,974.25 as of August 23, 2006.

$11,928.73, plus interest accruing at a rate of 12 percent or $3.92 per day.[5]  The issue before the court is the matter of priority.

### B.      The surplus

The real property was sold in six separate lots.  Neff owned Lots 5 and 6 and a one-half interest in Lot 4.  Neff claims a homestead exemption on Lots 5 and 6 but not in Lot 4.  Lot 4 sold for $55,000.  Lot 5 sold for $90,000.  Lot 6 sold for $10,000.  As Neff held just a one-half interest in Lot 4, only one-half of the proceeds from the sale of Lot 4, or $27,500, were available for application to the debt owed to the United States.  This produced a total of $127,500 from the sale of the Neff property.  After the Government was paid in full, $25,388.18, and the Marshal's fees were paid, $457.11, there was a surplus of $101,654.71.  The amount of the surplus is undisputed. $21,926.92 of the surplus is attributable to Lot 4.[6]  $71,758.06 of the surplus is attributable to Lot 5.[7]  $7,969.73 of the surplus is attributable to Lot 6.[8]

---

[5]  The Court notes the record is somewhat confusing as to the exact amount of Smith's claim.  The Court has reviewed the Writ of Execution issued by Burleigh County District Court (Docket No. 41).  The Writ of Execution is the only authoritative documentation of the debt owed to Smith in the record.  The Court relies upon this document in concluding that judgment was entered for Smith and against Wilbert Neff on September 28, 1999, in the amount of $11,928.73, with interest accruing at a rate of 12% per year or $3.92 per day.  The Court would also note that, while a copy of the judgment is not part of the record, it is a public record and the Court's review of the judgment in case number 8-99-C-1869 verifies that the Writ of Execution and Smith's amended application for surplus proceeds are correct.  The amount of Smith's claim is calculated on this basis.

[6]This is calculated as follows: $27,500 (Neff's 50% share of Lot 4) divided by $127,500 (gross sale proceeds) equals .2157.  21.57% of $101,654.71 (surplus proceeds) equals $21,926.92.

[7]This is calculated as follows: $90,000 (Lot 5) divided by $127,500 (gross sale proceeds) equals .7059. 70.59% of $101,654.71 (surplus proceeds) equals $71,758.06.

[8]This is calculated as follows: $10,000 (Lot 6) divided by $127,500 (gross sale proceeds) equals .0784. 7.84% of $101,654.71 (surplus proceeds) equals $7,969.73.

### C.    Smith's judgment claim

Smith's judgment against Neff was entered September 28, 1999, in the amount of $11,928.74 with interest accruing at a rate of $3.92 per day.  Interest has accumulated in the amount of $10,384.08 through December 31, 2006.[9]  That produces a total claim of $22,312.82 as of December 31, 2006.  With respect to Lot 4, there is no question that Smith has priority.  Smith's judgment lien on Lot 4 is clearly superior to any interest of the Government and the Government does not dispute this.[10]  Also, Neff's homestead claim is made only with respect to Lots 5 & 6.  Thus, Smith is due the entirety of the $21,926.92 in surplus proceeds attributable to Lot 4.  This leaves a balance due and owing on Smith's judgment of approximately $400.

Upon payment of $21,926.92 to Smith, there will be $79,727.79 left to disburse that is attributable to the sale of Lots 5 and 6.  If Neff has a valid homestead claim, Neff's claim prevails over Smith's claim for the reasons discussed in the next section and would exhaust the remaining amount available.

### D.    Neff's claimed homestead exemption

#### 1.    Neff's claim under North Dakota law

Neff's claim to the proceeds attributable to Lots 5 & 6 is based upon his assertion of a homestead exemption pursuant to North Dakota law.

---

[9] 2649 days from September 28, 1999 through December 31, 2006.

[10] Unlike Lots 5 and 6, Lot 4 was not being purchased on a contract for deed and no claim of homestead exemption has been made as to Lot 4.  The judgment lien of Smith likely did not attach to the land in Lots 5 and 6 because it was being purchased on a contract for deed giving Neff, as vendee, only an equitable interest in the property.  See North Dakota Title Standard 11-07(a vendee's interest in real property subject to a contract for deed is not an interest to which a judgment lien will attach by operation of law before fee title is conveyed to the vendee).  Although no lien exists, "an equitable interest in real estate under a contract for deed is subject to execution, levy, and sale." Farmers State Bank v. Slaubaugh, 366 N.W.2d 804, 807 (N.D. 1985).

North Dakota's homestead exemption has a long history. See Fed. Land Bank of Saint Paul v. Gefroh, 418 N.W.2d 602, 604 (N.D. 1988). When North Dakota came into the Union in 1889 provision for a homestead exemption was made in the North Dakota Constitution in what is now Article XI, § 22, which reads as follows.

> The right of the debtor to enjoy the comforts and necessaries of life shall be recognized by wholesome laws, exempting from forced sale to all heads of families a homestead, the value of which shall be limited and defined by law; and a reasonable amount of personal property; the kind and value shall be fixed by law. This section shall not be construed to prevent liens against the homestead for labor done and materials furnished in the improvement thereof, in such manner as may be prescribed by law.

The constitutional command that there shall be a homestead exemption is then carried out in several places in North Dakota's Century Code.  N.D.C.C. § 28-22-02 provides, in pertinent part, as follows:

> 28-22-02.  *Absolute exemption*.  The property mentioned in this section is absolutely exempt from all process, levy, or sale:
> . . . .
> 7.      The homestead as created, defined, and limited by law.

The remaining provisions that define and govern the homestead exemption are found in N.D.C.C. ch. 47-18 entitled "Homestead."  Pertinent to this case, § 47-18-01 defines the homestead and makes it exempt from any judgment liens, except as otherwise provided for in ch. 47-18:

> 47-18-01.  *Homestead exemption - Area and value*.  The homestead of any person, whether married or unmarried, residing in this state shall consist of the land upon which the claimant resides, and the dwelling house on that land in which the homestead claimant resides, with all its appurtenances, and all other improvements on the land, the total not to exceed eighty thousand dollars in value, over and above liens or encumbrances or both.  The homestead shall be exempt from judgment lien and from execution or forced sale, except as otherwise provided in this chapter.  In no case shall the homestead embrace different lots or tracts of land unless they are contiguous.

Section 47-18-04 then lists the judgments for which the homestead exemption <u>cannot</u> be claimed as follows:

> 47-18-04.  *When homestead subject to execution.*  A homestead is subject to execution or forced sale in satisfaction of judgments obtained in the following cases:
>
> 1.   On debts secured by mechanics' or laborers' liens for work or labor done or performed or material furnished exclusively for the improvement of the same.
> 2.   On debts secured by mortgage on the premises executed and acknowledged by both husband and wife, or an unmarried claimant.
> 3.   On debts created for the purchase thereof and for all taxes accruing and levied thereon.
> 4.   On all other debts when, upon an appraisal as provided by section 47-18- 06, it appears that the value of said homestead is more than eighty thousand dollars over and above liens or encumbrances thereon, and then only to the extent of any value in excess of the sum total of such liens and encumbrances plus said eighty thousand dollars.

Notably, the excluded judgments are characterized by the underlying debt being enforced.  Finally, North Dakota law provides in § 47-18-16 that "proceeds" from a sale of the homestead to satisfy liens to which the homestead exemption does not apply in § 47-18-04 are exempt:

> 47-18-16.  *Proceeds of sale exempt.*  If a homestead is conveyed as provided in section 47-18-05 or sold for the satisfaction of any lien mentioned in section 47-18-04, the price thereof or the proceeds of the sale beyond the amount necessary to satisfy such lien, and not exceeding in either case the amount of the homestead exemption, shall be entitled thereafter to the same protection against legal process as the law gives to the homestead.

Several points are particularly noteworthy regarding North Dakota's homestead law as applied to this case. The first is the degree of importance attached to the right and its state constitutional underpinnings.  The second is the fact that, under North Dakota law, neither Smith's judgment nor the Government's judgment trump Neff's homestead claim if it is valid and absent some enforceable waiver.  This is because neither judgments is for debts that are exempted from the application of the homestead law under § 47-18-04.

8

In terms of the merits of Neff's claim, there is no real dispute about the fact it has been timely and properly asserted.  Rather, the disputes regarding Neff's claim are three.  The first is the argument of both the Government and Smith that Neff had abandoned Lots 5 & 6 as being his homestead prior to the sale, and, for this reason, he is not entitled to claim the exemption as to the excess proceeds.  The second is Smith's argument that Lots 5 & 6 are separated by a road and are not sufficiently contiguous to be claimed entirely as a homestead.  The third is the Government's twin argument that it has priority over Neff's claim of a homestead exemption because certain language in its real estate mortgage either provided it with "additional security" for the otherwise unsecured chattel debt or "waived" Neff's right to claim the homestead exemption.

The claim of abandonment and the alleged lack of contiguity will be addressed next.  The Government's "additional security" and "waiver" arguments will be dealt with in the section addressing the Government's claim.

### 2.     Neff has not abandoned his homestead

Under North Dakota law, homestead statutes are to be liberally construed and the abandonment, loss, or relinquishment of the homestead is not favored.  Farmers State Bank v. Slaubaugh, 366 N.W.2d 804, 808 (N.D. 1985).  The party alleging a homestead has been abandoned must prove the abandonment by clear and convincing evidence.  Id.  And, absence from the property must coincide with an intent to discontinue the use of the property as one's home.  Id.  These principles regarding abandonment were first enunciated in Larson v. Cole, 33 N.W.2d 325, 328-29 (N.D. 1948).

In this case, for reasons discussed later herein, Neff's claim of exemption may be governed by  28 U.S.C. § 3014, which applies state law in subsection(a), but which also states in subsection

(b)(2) that "[u]nless it is reasonably evident that the exemption applies, the debtor shall bear the burden of persuasion."[11]  While there may be good arguments for holding this does not change any state law burden imposed on the Government to prove abandonment,  the court need not resolve that issue now because Neff has proved he has not abandoned the homestead by a preponderance of the evidence.

The dominant element in determining abandonment is intent.  Larson, 33 N.W.2d at 328. Subjective intent is not a reliable indicator and, for that reason, the courts look primarily to the objective intent which the debtor's actions demonstrate.  Slaubaugh, 366 N.W.2d at 808.  Finally, a finding of abandonment must be supported by the conclusion that the debtor left the homestead voluntarily and without the intent to return and occupy the homestead as a home.  Id.  It is action coupled with intent that must guide the court.  In re Lippert, 113 B.R. 576, 578 (Bankr. D.N.D. 1990).

The farmstead in question (i.e., Lots 5 & 6)  is located thirteen miles from McClusky, North Dakota, and for decades prior to the sale was the Neff family farm.  Neff moved onto the farmstead with his parents in about 1939, when he was two years old, and physically resided there for almost his entire life until, in recent years, he started staying in town to help care for his mother.  Neff was the fourth generation of his family to farm the land. (Tr. 44, 50)

The Government's and Smith's argument for abandonment  rests upon the following facts: that Neff in recent years has been living in town with his mother and not on the farmstead;  that Neff has not paid taxes on the farmstead for some five or six years and has not maintained insurance on

---

[11]  If § 3014 does not apply, Fed. R. Civ. P. 69 makes state law applicable for reasons discussed later herein.

the property; that the exterior of the farm house is in disrepair; that Neff's mail is presently being delivered at his mother's house in McClusky; and that he has recently voted in the City.  (Tr. 22)

In response, Neff acknowledged he is now residing with his mother in McClusky, but testified that it has only been for the purpose of helping care for her and that he has not abandoned the farmstead as being his homestead as of the time of the sale and was hoping some day to return. More specifically, Neff introduced credible evidence establishing the following:

- Neff had begun staying in town with his mother in 2001. (Tr. 20).  For the first six months to a year, he stayed just a few nights a week. (Tr. 37).  After an incident, where his mother fell and could not get up, he began staying with her every night. (Tr. 37).  She fell on another occasion, as well, and her home in McClusky is situated such that she has no neighbors close by. (Tr. 38).

- Neff's mother is now eighty-eight years old. (Tr. 36).  She has crippling arthritis and eye problems. (Tr. 36).  Her eyesight is such that she cannot see the television and has trouble recognizing people. (Tr. 39).  She does not drive a car. (Tr. 40).  She cannot read due to her failing eyesight. (Tr. 43).   Clearly, Neff's mother has needed someone to assist her and this is what Neff has been doing while staying with his mother.  In addition to watching over her, Neff  has been doing all the cleaning, gardening, and yard work. (Tr. 41).  He has also has been taking his mother to her doctor appointments and to the grocery store. (Tr. 42).

- Neff does not have an ownership interest in his mother's house. He testified that, if his mother had passed away, he would have moved back to the farmstead where he had otherwise lived almost his entire life.  (Tr. 27, 45)

11

- As of the time of the sale, Neff had not moved his furniture, including his beds, couch, and kitchen stove from the farmhouse.  He had continued to watch the property regularly, put out rodent poison, and pay for electricity at the farmstead - keeping the yard light on, but turning the power off to the house.  (Tr. 19, 20, 58, 64-67)  For the first couple of years after he started staying in town, Neff continued to heat  the farmhouse but quit doing so when it got too expensive. (Tr. 20).  As of the time of the sale, the furnace and well were still in working condition and the electricity could have been be restored to the house with the simple flipping of the switch in the yard.  (Tr. 20-21)  Neff stated that all that was needed to make the interior liveable, at least for him, was some washing, painting, and one storm door.  Neff is single man, living a simple life.  While many might find the farmstead to be too primitive, the credible evidence is that it was sufficient for Neff, that he could have made the premises liveable with the minimal amount of effort he described, and that the living conditions would be no worse than for many others in this country who are living on the borderline of poverty.

- Neff testified that he had difficulty getting insurance because the company did not want to insure the property while it was vacant.  Also, Neff's only source of income during much of this time was  his Social Security and part-time work at Polar Ware. (Tr. 26, 24).

-  The Government advanced money to pay the taxes pursuant to its  mortgage for part of the five or six years that the Government states  Neff did not pay the taxes and has now been repaid  with the foreclosure of the mortgage. (Tr. 56) As of the date of the

12

sale, Neff was several years delinquent in the real estate taxes.  But, the property had not yet been foreclosed for taxes, Neff had time to bring the taxes current, and, as evidenced by the sale, there was substantial equity in the property. (Exhibit 4)

• As for the mail delivery,  Neff testified that he instructed the local postmaster to put his mail in his mother's post office box so he would not have to drive out to the farm to get his mail.  (Tr. 44, 47)  This testimony was credible.  In terms of voting, the rural and city precincts all voted in the same room at the McClusky city hall and the fact that Neff may have ended up in the wrong line is at best ambiguous in terms of the issue of intent.  (Tr. 46-47)

Following the principles previously discussed, North Dakota courts have generally not found abandonment when the owner has left one homestead, but has not taken up another and there is evidence the owner may return.  In one case a teacher was held to not have abandoned her homestead where it was shown she had moved to Wisconsin to pursue a masters degree, initially putting her homestead up for sale and later renting the property out.  In re Murphy, 292 B.R. 403, 406 (Bankr. D.N.D. 2003).  The court noted that even an absence for years does not constitute abandonment where the intent to return remains.  Id. at 407.  This is because, as explained in another case, an evolving intent to abandon is insufficient to show abandonment and it must be presumed that a person would not abandon one homestead prior to acquiring a new one.  In re Lippert, 113 B.R. 576, 578 (Bankr. D.N.D. 1990).

Also, along the same lines, the North Dakota courts have been loath to find abandonment when there are good reasons for the debtor's absence from the homestead.  In one case, where the defendant had been called away for military service for four years, sold most of his household

possessions, and rented his property to another individual, his absence was held not to be voluntary and he was allowed to retain his homestead. Larson, 33 N.W.2d at 328-29. And, in another case, the court held that absence due to poor health does not necessarily constitute abandonment. Meidinger v. Security State Bank of Medina, 213 N.W. 850, 851 (N.D. 1927); see also Farstveet v. Rudolph, 630 N.W.2d 24, 33 (N.D. 2001) (involuntary or compulsory absences have never constituted *per se* abandonment of homestead rights).

In this case, the assertion that the Neff homestead was uninhabitable has not been proven. The photographs of the exterior do show it to be in need of some repair, but the credible evidence is that Neff would have been able to make the premises habitable, at least for his purposes, with a minimal amount of work. Further, even if more extensive work had been required, this does not necessarily equate with an intent to abandon the property and not return. Likewise, the same is true for the other points made by the Government and Smith with respect to non-payment of insurance and taxes and the voting. Neff offered credible explanations for all of these points and they are not persuasive in terms establishing an intent not to return.

Rather, the following points are more persuasive and support the conclusion that Neff had not abandoned his homestead: Neff's ties to family farm; the fact he left behind significant items of personal property in terms of furniture and the stove that would have allowed his return; his conduct in continuing to watch over and maintain the farmstead to the extent his finances permitted, including paying to keep the electricity on at the pole and the yard light; the legitimate explanation for his absence, *i.e*, the taking up of temporary residence with his ailing mother; the fact that he has no ownership in his mother's house; and the fact that he had not established a homestead elsewhere.

14

When all of these points are considered, Neff has more than met any burden he may have in demonstrating non-abandonment.

### 3.      Lots 5 and 6 are sufficiently connected to be claimed as homestead

Neff claims that Lot 5 (Section 30–NE1/4NW1/4 and NE1/4) and Lot 6 (Section 29–NW1/4NW1/4) are his homestead.  Physically, these two lots abut each other and together comprise roughly 320 acres.  While the record is a little vague, it appears the lots are divided by a narrow road or rough trail along the section line. (Tr. 35 & Exhibit 50).

North Dakota law provides that in "no case shall the homestead embrace different lots or tracts of land unless they are contiguous." N.D.C.C. § 47-18-01.  Smith argues that the presence of the road destroys the contiguity required to claim the homestead  and cites  In re Schriock, 192 B.R. 514 (Bankr. D.N.D. 1995) in support.  However, Schriock involved a claimed homestead exemption of ten separate city lots.  In that case, the court disallowed the claimed exemption to all but two of the lots because of the lack of relationship or interdependency between the lots, especially given the urban setting.  Id. at 516.  Schriock, however, is hardly analogous given the fact that, in this case, the two tracts are in a rural setting, they have been farmed together as one unit, and they have been considered the Neff family farm since 1939. In other words, there is a relationship and interdependency between the lots that was not present in Schirock.

Morever, Smith neglects to point out that the court in Schriock also stated with regard to farmland that "certainly it can be readily seen how two tracts of farmland jointly farmed from many years but separated only by a public road might be regarded as contiguous in terms of use and dependency." Id. at 515.  And, the prevailing view is that the mere existence of a road separating

two plots of property will not defeat the contiguous nature of the property for homestead exemption purposes. 40 Am. Jur. 2d. Homestead § 33.

In this case, the mere existence of the dirt trail or section line road between the lots is not enough to defeat the homestead claim.

### E.      The Government's Claim

The Government's claim to the surplus from the sale of the real estate is based entirely upon its deficiency judgment with respect to its chattel debt.  There is no dispute regarding the amount of the Government's claim.  Rather, the issue is whether the Government's claim to the surplus comes before any distribution to Neff based upon his claim of homestead exemption.

The Government's argument that it comes first is based entirely upon certain provisions of its real estate mortgage, even though the debt that was specifically secured by the mortgage has been totally satisfied, and the debt that it now seeks to enforce was not contemporaneously cross-collateralized by the real estate.

The mortgage securing the real estate debt was granted in 1977.  The chattel loan was made in 1986, some nine years later, and was rescheduled in 1990.  The chattel notes were secured by a chattel mortgage and crop security agreements, but at no time was there a contemporaneous instrument granting the Government a security interest in the real estate.

Before turning to the substance of the Government's claim, it important to first note that federal law has long given effect to claims of state exemptions, including homestead exemptions, upon execution of judgments in federal civil actions for collection of debts.  Fink v. O'Neil, 106 U.S. 272 (1882); Fed . R. Civ. P. 69.  This includes cases where the Government itself is the creditor

and is seeking to enforce a judgment on a debt owed the Government that has not been secured by

the real estate.  28 U.S.C. § 3014; see id.[12]

   In this case, the Government does not argue that  North Dakota's homestead exemption law

is inapplicable to money judgments in favor the United States for debts that are not secured by the

real estate.  Rather, the Government has two arguments for avoiding the homestead claim.  The first

is that a paragraph in the real estate mortgage, which  describes how any excess proceeds from a sale

of the real estate are to be applied, gives the Government priority, essentially in the form of an

additional security interest in debt that was not specifically secured by the mortgage, such that it can

---

   [12]  In Fink v. O'Neil, the issue was whether a judicial act passed in 1872 intended that state laws exempting homesteads from execution would apply in federal civil actions and, in particular, to executions issued in favor of the United States when it was a party creditor.  106 U.S. at 277.  The 1872 act provided that parties recovering judgments in federal court would have the rights upon execution as provided for by state law, but did not specifically reference the applicability of state exemption laws.  In construing the 1872 act, the Supreme Court reviewed the history of prior acts dating back to the judiciary act of 1789.  The court concluded that the consistent policy of  federal law prior to passage of the 1872 act had been to look to state law for rights and remedies upon execution of federal civil judgments and that the cases construing earlier acts had held that this included application of state exemption laws.  As a consequence, the Court concluded that the intent of the 1872 act was to continue the law as it had developed up to that point.  Further, the court held that state homestead laws would apply in actions brought by the United States when the real estate was not charged with the debt because there was nothing in the language of the statute that suggested the United States should be treated differently from any other creditor.  Id. at 277-285.
   The 1872 act construed in  Fink v. O'Neil was later replaced by Fed. R. Civ. P. 69, which now provides in pertinent part:
      The procedure on execution, in proceedings supplementary to and in aid of judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable.
United States v. Yazell, 382 U.S. 341, 354-355 (1961); see generally C. Wright, A. Miller & R. Marcus, 12 Federal Practice and Procedure Civil 2d §§ 3011-3012 (1996).  Rule 69 has been interpreted as continuing the pre-existing law of making state exemptions from execution applicable in federal civil actions, including the homestead exemption.  Id.
   While there are special federal statutes that govern collection of certain types of judgments in favor of the Government, there were none until 1990 that applied to judgments of the type at issue here, which is for a money judgment together with an order for sale of chattel security.  See id.  In 1990, Congress enacted the Federal Debt Collection Procedures Act of 1990 ("FDCPA"), which, for the first time, has attempted to codify procedures that apply to the collection of federal debts generally.  As applied to this case, the FDCPA has changed the pre-existing law only to the extent that debtors now have a choice between the exemptions allowed by state law or the federal exemptions allowed debtors under 11 U.S.C. § 522(d), which is part of the  federal bankruptcy law.  28 U.S.C. § 3014(a).  See generally Validity, Construction, and Application of Federal Debt Collection Procedures Act, 119 A.L.R. Fed. 505, § 1 (1994).
   In summary, it has been clear, at least since the Supreme Court's decision in Fink v. O'Neil in 1882, that debtors are entitled to claim the benefit of state homestead protections from executions upon money judgments in favor of the United States, except when the real estate has been charged with the debt that is the subject of the judgment.

avoid the homestead exemption claim.  The second is that the same language, together with additional language in another paragraph, constitute a waiver by Neff of his homestead rights.  Or, to put another way, the Government's argument is that the certain provisions in the real estate mortgage, which was given as security for the real estate debt, allow it to do what it could not do directly, *i.e.*, avoid Neff's homestead claim upon an attempt to sell the homestead property in a separate action brought just to satisfy the chattel debt.

 For the reasons set forth below, the Government is misreading its mortgage; the language it relies upon does not provide it with "additional security" nor does it constitute a "waiver"of the right to claim a homestead exemption with respect to the chattel debt.  Also, even though federal law applies, federal law looks to state law in this instance to govern the rights of the parties. And, applying state law, the provisions the Government relies upon are unenforceable to the extent they purport to trump Neff's homestead claim.

### 1.   The Government's interpretation is contrary to the intended meaning of the mortgage language

Federal common law governs the interpretation of a contract to which the United States is a party.  E.g.  United States v. Seckinger, 397 U.S. 203, 209-210 (1970).  It looks to the best law as set forth in modern decisions of the federal and state courts, e.g., United States v. Basin Electric Power Cooperative, 248 F.3d 781, 796 (8th Cir. 2001); A.W.G. Farms, Inc. v. Federal Crop Ins. Corp., 757 F.2d 720, 726 (8th Cir.1985), and takes into consideration traditional rules of contract construction, e.g., United States v. Seckinger, 397 U.S. at 209-21; Bull v. U.S., 65 Fed. Cl. 407, 412 (2005); Harrison Western Corp. v. United States, 792 F.2d 1391, 1393 (9th Cir.1986).

A fundamental objective in construing a contract is to attempt to give effect to what were the mutual intentions of the parties at the time the contract was made.  E.g. United States v. Basin

18

Electric Power Cooperative, 248 F.3d at 805; see generally Restatement (Second) of Contracts §§ 200-20; 17A Am. Jur. 2d Contracts § 350-352.  But, if it appears the parties construed the language differently, the court must then determine whose construction prevails assuming there is sufficient assent to have an agreement.  See id.

   In interpreting the contract language, one of the primary things that the court must do is to give the words of the agreement their ordinary meaning, unless the parties mutually intended some other meaning, and to interpret the contract in a way that gives effect to all of its provisions.  Along the way, there may be other principles of contract interpretation that have to be relied upon, including, for example, consideration of the subject matter, nature, and purpose of the contract.  See generally Restatement (Second) of Contracts § 202; R. Lord, 11 Williston on Contracts § 30:2 (4th ed.); 17A Am. Jur. 2d Contracts §§ 354, 359, 385-386.

   Turning to the specific language of the mortgage, it should first be observed that the title of the document identifies the contract as being a real estate mortgage.  While this may have special significance for commercial lawyers, even the average person understands that the purpose of a real estate mortgage is to secure the debt for which the mortgage is granted, but, generally, not other debt.

   There next appears language stating that the mortgage secures repayment of specific identified promissory notes, together with any renewals,  extensions, and monies advanced by the Government to protect its mortgage lien, including payment of taxes and insurance.  Notably, there is no indication that the mortgage is given to secure payment of debt that is not referenced in the mortgage, nor is there a clause that explicitly makes all loans subsequently made by the Government subject to the mortgage.

Following the language granting the mortgage lien, there are a series of paragraphs that provide authority for the Government to take action to protect its lien interest, that require the borrower to do certain things to preserve the property, and that define default.  Again, the focus of these paragraphs is the real property secured by the mortgage and the specific debt for which the mortgage is given.

Next is paragraph 17, which defines what the Government is entitled to do upon default, including the right to declare "the entire amount unpaid under the note and any indebtedness to the Government *hereby secured* immediately due and payable." (emphasis added)  Paragraph 17 then goes on to describe what rights the Government can exercise with respect to the mortgaged property, including the right to sell the property to satisfy the debt secured by the mortgage and any debt incurred in protecting the mortgage lien.  Again, the focus is upon the specific debt for which the mortgage is given and the real estate that secures the debt.

It is not until paragraph 18 that we get to language that the Government, in part, relies upon for its claim of priority.  Prior to that, there is nothing in the mortgage document that suggests the Government is being given any rights to the real estate for debt that is not the subject of the mortgage.  In fact, all of the language of the agreement suggests otherwise.  Paragraph 18 reads in full as follows:

> (18)  The proceeds of the foreclosure sale shall be applied in the following order to the payment of: (a) costs and expenses incident to enforcing or complying with the provisions hereof, (b) any prior liens required by law or a competent court to be so paid, (c) the debt evidenced by the note and all indebtedness to the Government secured hereby, (d) inferior liens of record required by law or a competent court to be so paid, (e) at the Government's option, any other indebtedness of Borrower owing to or insured by the Government, and (f) any balance to Borrower.  At foreclosure or other sale of all or any part of the property, the Government and its agents may bid and purchase as a stranger and may pay the Government's share of the purchase as a stranger and may pay the Government's share of the purchase price

by crediting such amount on any debts of Borrower owing to or insured by the
Government, in the order prescribed above.

(emphasis added).

As can be observed from the highlighted text, paragraph 18 does give the Government the
right, at its option, to have any surplus from the sale of the real estate applied to other debts owed
to the Government prior to any distribution to the borrower.  The Government argues that the lack
of a specific proviso allowing the debtor to claim the homestead exemption means it cannot be
claimed either because the language in question gives the Government a security interest in the
"other indebtedness" or that the language amounts to a waiver of the debtors's statutory right to
claim a homestead exemption as to debt that is not secured by the real estate.

The more plausible interpretation of paragraph 18, however, is that it does neither and that
its silence with respect to the homestead right is simply a function of the generality of the language
and not an expression of an intent to disallow the exercise of the homestead right, which arises
independent of the mortgage.   Further, this becomes even more obvious, when the language in
paragraph 18 is considered in the context of the entirety of the mortgage and its purpose.   In
particular, the following are noted:

- All of the language in the mortgage prior to paragraph 18 is consistent with
  the generally understood notion that the purpose of the mortgage is to
  provide security for the debt secured by the mortgage and not priority with
  respect to other debt.

- There no language in the mortgage agreement specifically granting the
  Government a security interest in the "other indebtedness."  In fact, the
  Government's claim of "additional security" is contrary to other provisions

21

of the mortgage that specifically identify the debt that the mortgage is given to secure.  Hence, the Government's real argument is one of waiver, not "additional security."

- By the time the mortgage gets to addressing what to do with the proceeds from the sale in paragraph 18, the primary purpose of the mortgage has already been accomplished, *i.e.*, the real estate has been sold and the mortgage debt has been satisfied.  Hence, there is not a need at that point for the language of the mortgage to cover all possible contingencies, particularly when the problem of dealing with excess proceeds does not arise in every situation because many times there will be a deficiency.

- The language in question and the mortgage document itself are generic and apply to all kinds of real property - not just homestead property.  In other words, when the property secured by the mortgage is not homestead property, the language in question can be applied meaningfully and without further issue.  On the other hand, the situation can be more complicated if homestead property is involved, and, particularly, if there is a mixture of homestead and non-homestead property given the generally recognized right of the debtor to be able to request a separate sale of the non-homestead property first.  See, e.g., N.D.C.C. § 47-18-12; see generally 40 Am. Jur. 2d Homestead §§ 86-87. & 111. This, coupled with the brevity of the language relied upon by the Government, suggests that it was not intended to comprehensively address all of the contingencies and rights provided for independent of the mortgage.

22

- The right to claim the homestead exemption arises independent of the mortgage and is granted by statute.

In summary as to paragraph 18, the foregoing makes plain that the language in question was drafted merely to allow the Government the right of offset and that its silence with respect to well-established homestead rights is simply a function of the generality of the language and not an intent to deprive debtors of the homestead exemption in those instances in which the property that has been sold happens to be homestead property.

The Government also points to paragraph 19 of the mortgage to further support its "waiver" argument, which in its entirety reads as follows:

> (19)  Borrower agrees that the Government will not be bound by any present or future State laws, (a) providing for valuation, appraisal, homestead or exemption of the property, (b) prohibiting maintenance of an action for deficiency judgment or limiting the amount thereof or the time within which such action may be brought, (c) prescribing any other statute of limitations, (d) allowing any right of redemption or possession following any foreclosure sale, or (e) limiting the conditions which the Government may by regulation impose, including the interest rate it may charge as a condition of approving a transfer of the property to a new Borrower.  Borrower expressly waives the benefit of any such State law.  Borrower hereby relinquishes, waives, and conveys all rights, inchoate or consummate, of descent, dower, and curtesy.

Paragraph 19 does contain language which states the borrower "agrees" the Government will not be bound by state homestead laws.  But, the critical question here is in what context?

As can readily be observed, the reference in item 19(a) to state exemption and homestead laws is actually part of a long list of state laws in paragraph 19 that the borrower "agrees" are not applicable.  In particular, item 19(a) also mentions state laws governing valuation and appraisal of the property, and 19(b) through 19(e) reference state laws that: prohibit deficiency judgments; apply state statutes of limitations; allow for a right of redemption or possession after sale; limit the amount

of interest that can be charged;  and restrict transfer of the property following foreclosure.  And, what is particularly noteworthy about this list is that several of the referenced laws are associated primarily, if not exclusively, with the enforcement of real estate mortgages (*i.e*, the laws that prohibit deficiency judgments, allow rights of redemption, allow for possession following sale, or limit the subsequent transfer of the property) and have nothing to do with collection of  non-real estate debt. In other words, when considering all of paragraph 19, the more reasonable interpretation is that its purpose is to make certain that state laws do not frustrate the Government's enforcement of its mortgage lien as to the debt secured by the mortgage, but that the language was not intended to somehow constitute a waiver of state laws, including well-established homestead rights, that normally apply to the collection of  debt that is not secured by the real estate.

Moreover, this interpretation is further reinforced by looking at the particular language of 19(a) that contains the reference to state exemption and homestead laws, which reads:

> Borrower agrees that the Government will not be bound by any present or future State laws, (a) providing for valuation, appraisal, homestead or exemption <u>of the property</u>, . . .

(emphasis added).  While the term "property" is not defined in the mortgage, the most obvious interpretation in the context of the use of the words "valuation" and "appraisal," which precede it, is that it refers to the real property that was sold to satisfy the mortgage and not to any excess proceeds from the sale.

A well-established principle of both contract and statutory interpretation is that of *nositur a sociis*, which is that the meaning of a contract word or phrase can be gleaned by the words or phrases immediately associated with it.  <u>See</u> <u>generally</u> J. Perillo & M. Kniffin, 5 <u>Corbin on Contracts</u> § 24.28 (1998) ["Corbin on Contracts"].  In <u>Jarecki v. G. D. Searle & Co.</u>, 367 U.S. 303 (1961), the

Supreme court observed that this principle is often applied "to avoid giving language susceptible to multiple meanings unintended breadth." Id. at 307. And, in this case, this is precisely why this principle should be applied in construing paragraph 19 to limit the so-called "waiver" of homestead to only the collection of the debt secured by the mortgage lien.[13] Everything else in the mortgage, including its commonly understood purpose, suggests that the broader interpretation argued by the Government was not intended.

In summary, a commonsense application of the mortgage language does not support the Government's "additional security" and "waiver" interpretations. Further, this is even more true when the language is considered in the context of the commonly understood purposes and applications of a real estate mortgage. But, even if the Government's interpretation presents a closer question than what the foregoing suggests, there are several principles of contract construction that tip the balance in favor of Neff and against the constructions proffered by the Government. These will be addressed next.

### 2. The Government's interpretation is contrary to public policy

Laws protecting the homestead are a well-established feature of American law. The obvious importance of the homestead right in North Dakota has already been touched upon, and North Dakota's law is by no means unique since virtually every state offers some form of homestead protection.

Generally speaking, the important public policies that are said to be served by the homestead exemption include: promotion of the stability and welfare of the state; encouragement of property

---

[13] This interpretation does not render superfluous the provision stating that the government is not bound by state homestead laws. Some states require such a waiver for a mortgage to be effective as to homestead property and a few states, at least at one time, imposed severe limitations upon the mortgaging of homestead property. See generally 40 Am. Jur. 2d Homestead §111.

ownership and economic independence; and, perhaps, most importantly, protection of the debtor and his family during times of economic hardship by providing a guarantee of shelter.   40 Am. Jur. 2d Homestead § 4.  In North Dakota, the state supreme court has characterized the homestead right as follows:

> Crucial as homes are to the well-being of our people, the right not to be easily deprived of a home seems obviously to rise to the level of an "important substantive right." Under these circumstances unless there is a close correspondence between the statute herein under attack and the legislative object of the statute, the statute must be stricken as unconstitutional.

Mund v. Rambough, 432 N.W.2d 50, 57 (N.D.1988).

Morever, it is not just state law that recognizes the importance of providing a modicum of protection from creditors in the time of economic distress.  As already discussed, federal law has long given effect to state exemptions from execution in federal civil actions to collect debts, including the homestead when it has not been specifically charged with the debt.  And, this now includes the Federal Debt Collection Procedures Act of 1990 ("FDCPA").  In fact, FDCPA not only allows state exemptions to be claimed under 28 U.S.C. § 3014, it requires the United States as part of its debt enforcement effort to provide specific notice to the debtor of the existence of the major state exemptions that are available  under  § 3202(b), and it appears to provide under § 3203(h) that the debtor takes first any exempt amounts from the proceeds of property sold to satisfy the debt - even prior to the costs of sale.  In addition, the strong public policy favoring the protections afforded by state exemptions,  including the homestead exemption, is carried forward in federal bankruptcy law that allows debtors to claim the benefit of state exemptions under 11 U.S.C. § 522(b), despite the fact this can lead to substantial disparities in outcomes depending upon the generosity of the particular states' homestead laws.

26

A well-established principle of contract construction is that, all things being equal, the construction that serves the public interest should be preferred.  See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 (1995); United States v. Seckinger, 397 U.S. 203, 211-213 (1970); see generally   Restatement (Second) of Contracts  § 207; Corbin on Contracts  § 24.25. In this case, given the strong preference accorded homestead rights by both state and federal law against claims by general creditors, including the United States, the construction applying the waiver of homestead rights to only the Government's enforcement of its mortgage lien, and not to other debt that has not been secured by the mortgage, is obviously favored.

A good example of the application of the principle of preferring the construction that favors public policy is the case of  United States v. Seckinger, supra.  In that case,  the United States sued one of its contractors after the Government was found to have been at fault for personal injuries sustained by one of the contractor's employees in an earlier federal tort claim action.  The basis for the Government's suit against the contractor was its argument that the contractor was also at fault and that it should be held liable to the Government for what it had to pay out to the contractor's employee.  The issue before the Court was whether the general language of the contract clause made the contractor liable not only for its own negligence, but also for the negligence of the Government. In rejecting the government's interpretation, the Supreme Court relied, in part, upon the general principle, which was described as being "accepted in virtually every American jurisdiction," that a person should not be permitted to recover for his or her own negligence unless the court is convinced this was what the parties actually intended.  Id. at 212-213.

The Government may argue that public policy favors repayment of public debt.  While this generally may be true, the Government has already made the calculated decision as a matter of

public policy to allow federal debtors to claim state homestead protections when the debt owed to the Government has not been secured by  the real estate, as already indicated.  Further, the Government has the right when it makes a loan to "cross-collateralize" the debt against the real estate  and obtain additional security when it decides it is in the public interest.

### 3.        The language should be construed against the drafter

Another well-recognized principle of contract construction when language is susceptible to multiple meanings is to construe the language against the drafter.  See generally  Restatement (Second) of Contracts  § 206; Corbin on Contracts § 24.27.  The Supreme Court has held that this principle applies even when the Government is the drafter.  United States v. Seckinger, 397 U.S. at 210.

In this case, the mortgage is clearly the Government's form document[14] and the language in question is not only susceptible to multiple meanings, it is contrary to what otherwise would be the general expectations of the debtor, established commercial practice, and well-established federal law that allows the assertion of state homestead exemptions with respect to debt that is not secured by the real estate.  Further, given its superior bargaining power, the Government had every opportunity to make explicit that the "waiver" of homestead rights extended not just to the debt secured by the mortgage, but also to other debt in the event of a surplus - if that was its intention, which is extremely doubtful.[15]  Cf. Seckinger v. United States, 387 U.S. at 211-213; see generally Corbin on

---

[14]   Form FmHA 427-1 ND

[15]   The Government has not proffered one regulation, operating policy, or instruction manual that suggests the language in question is relied upon to provide "additional security" for debt that is not specifically secured by the mortgage or that it was drafted to provide for a waiver of homestead in this situation.  Moreover, a review of FSA's current regulations in Title 7 of the Code of Federal Regulations reveals no such use or intent.  For example, there is not one hint of this in 7 C.F.R. § 1941.19, which outlines the procedures for making operating loans  in terms of the necessity for obtaining chattel security and, when there is not sufficient chattel security, security in the debtor's real estate by

Contracts § 24.27.  This is a classic case for applying the doctrine of *contra proferentem*.

       **4.**      **Even if the Government's construction of the mortgage language is correct, the claimed "waiver" of homestead is unenforceable as a matter of law**

            **a.**      **State law that allows a claim of homestead to be made with respect to debt that is not expressly secured by the real estate cannot be waived**

Under North Dakota law, the homestead exemption can be claimed with respect to all executions and process, save for a handful of statutory exceptions of which the debt being enforced in this case is not one.  N.D.C.C. §§ 28-22-02 & 47-18-04.  Given the importance of the public policies supporting the homestead right, it appears that the statutory protections allowing the homestead to be claimed, except in limited situations, cannot be waived - at least in advance of the time for claiming the exemption.  Cf. First State Bank of New Rockford v. Anderson, 452 N.W.2d 90, 92 (N.D. 1990) (holding that statutory rights can be waived unless the waiver is against public policy and citing examples of similar statutory protections that cannot be waived); Conlon v. City of Dickinson, 5 N.W.2d 411, 414-415 (N.D. 1942); Douglas County State Bank v. Steele, 210 N.W. 657, 660 (N.D. 1926) ("a mortgage on a homestead and other property may fairly be interpreted as a waiver of the homestead right only so far as may be necessary to secure the debt"); Swingle v. Swingle, 162 N.W. 912, 915-916 (N.D. 1917) (purported waiver of homestead right in an ante-nuptial agreement held unenforceable and citing other case law prohibiting waiver of the right in advance of the time for claiming it).[16]  Courts in many other jurisdictions have reached the same

---

obtaining a real estate mortgage.

    [16]  The homestead right, however, may be the subject of waiver in other contexts such as by voluntary abandonment of the homestead property under the case law already cited.

conclusion in terms of prospective waivers of exemptions, including the homestead exemption. E.g., Sherbill v. Miller Mfg. Co., 89 So.2d 28 (Fla. 1956) (waiver of homestead right  in note not enforceable); Industrial Loan & Investment Co. of San Francisco v. Superior Court of California in and for City and County of San Francisco, 209 P. 360, 361 (Cal. 1922); see generally  Validity of Contractual Stipulation or Provision Waiving Debtor's Exemption, 94 A.L.R.2d 967, § 2[a] (1964) ("Many cases support the view that attempted waivers of a debtor's rights under exemption laws are, at least where intended to be operative in the future, against sound public policy and hence invalid.")

In other words, if North Dakota law applies, the mortgage provisions relied upon by the Government for its claim of waiver are unenforceable to the extent that they purport to trump a claim of homestead with respect to debt that  is (1) not secured by a real estate mortgage and (2) that state law  allows claiming a homestead exemption.   Or, to put it even more simply, North Dakota law prohibits boiler-plate waivers of homestead rights in advance of the time of being able to claim the homestead exemption in circumstances such as presented by this case.

Somewhat more difficult, however, is the question of whether the United States  is bound by state law to the extent it renders the purported waiver unenforceable.  For example, there are  a number of cases holding that the Government is not bound by state procedural limitations upon the enforcement of its mortgage rights. E.g., Farmers Home Admin. v. Muirhead, 42 F.3d 964 (5th Cir. 1995) (state statutes of limitations); United States v. Victory Highway Village, Inc., 662 F.2d 488, 497-498 (8th Cir. 1981) (state redemption laws);  United States v. Thompson, 438 F.2d 254 (8th Cir. 1971) (state law requiring that the sale be on credit).  But these cases are distinguishable on the grounds that the state laws in question were held to unjustifiably frustrate the Government's enforcement of  clearly established mortgage rights.  This case, on the other hand, is more closely

30

akin to the Supreme Court decisions in  United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979)

and United States v. Yazell, 382 U.S. 341 (1966), as well as the previously cited case of Fink v.

O'Neil, supra.

In Kimbell Foods, the Supreme Court considered whether contractual liens arising from

federal loan programs should take precedence over private liens allowed by state law, when there

is no federal statute establishing priorities. The question was presented to the Court in two

consolidated cases, one involving a lien claimed by the Small Business Administration ("SBA") and

the other a lien claimed by the former Farmers's Home Administration ("FmHA").  In addressing

the question, the Court held that federal law governs the administration of nationwide federal

programs, but there are times that federal law will look to state law for providing the necessary rules.

440 U.S. at 726.   The Court stated:

> Controversies directly affecting the operations of federal programs, although
> governed by federal law, do not inevitably require resort to uniform federal rules. See
> Clearfield Trust Co. v. United States, supra, at 367, 63 S.Ct., at 575; United States
> v. Little Lake Misere Land Co., supra, 412 U.S., at 594-595, 93 S.Ct., at 2397-2398.
> Whether to adopt state law or to fashion a nationwide federal rule is a matter of
> judicial policy "dependent upon a variety of considerations always relevant to the
> nature of the specific Governmental interests and to the effects upon them of
> applying state law." United States v. Standard Oil Co., 332 U.S. 301, 310, 67 S.Ct.
> 1604, 1609, 91 L.Ed. 2067 (1947).

Id. at 727-728 (footnotes omitted).  The Court then went on to describe the considerations that

should  govern a court's decision in any particular case as to whether state law should be applied

or whether some uniform rule of federal law should be fashioned:

> Undoubtedly, federal programs that "by their nature are and must be uniform in
> character throughout the Nation" necessitate formulation of controlling federal rules.
> United States v. Yazell, 382 U.S. 341, 354, 86 S.Ct. 500, 507, 15 L.Ed.2d 404
> (1966); see Clearfield Trust Co. v. United States, supra, 318 U.S., at 367, 63 S.Ct.,
> at 575; United States v. Standard Oil Co., supra, 332 U.S., at 311, 67 S.Ct., at 1609;
> Illinois v. Milwaukee, 406 U.S. 91, 105 n. 6, 92 S.Ct. 1385, 1393, 31 L.Ed.2d 712

(1972). Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision. Apart from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the federal programs. If so, we must fashion special rules solicitous of those federal interests. Finally, our choice-of-law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.

Id. at 728-729 (footnotes omitted).

In applying the foregoing consideration to the cases before it, the Court concluded that, with regard to the programs administered by the SBA and the former FmHA, there was not a need for a uniform body of federal laws with regard to the priority of the Government's liens relative to private liens as recognized by state law and that state law should apply. The court noted that both agencies had tailored their lending practices to comply with state law in this instance so that looking to state law would not frustrate the objectives of the federal programs. Id. at 729-738. Further, the court expressed concern that adoption of special federal rules with regard to priority would be disruptive of state commercial practice. Id. at 739.

In reaching its decision in Kimbell Foods, the Supreme Court relied, in part, upon its earlier decision in United States v. Yazell, supra. In Yazell, the SBA had made a disaster loan to a husband and wife for their small business and took a security interest in the chattel property of the business to secure the loan. The problem in that case arose when the SBA sought to enforce its judgment collecting upon the debt against the wife's other property, which, at that time was contrary to the Texas law of coverture. 382 U.S. at 344-348. Despite the observation that the law of coverture was "peculiar and obsolete," the Court in Yazell held it should apply, nonetheless, for essentially the same reasons that the Court later relied upon in Kimbell Foods. And, even more pertinent to this case, the Court in Yazell reached its decision in substantial part by concluding that the Texas

32

coverture law was similar in principal to state laws exempting homesteads from process, which the

Court observed federal law had long recognized as applying to the enforcement of federal debt

claims, despite the fact that application of state exemption laws can produce divergent results from

state to state, depending upon the generosity of the exemptions permitted.  The Court stated the

following:

> On the other hand, in the type of case most closely resembling the present problem, state law has invariably been observed. The leading case is <u>Fink v. O'Neil</u>, 106 U.S. 272, 1 S.Ct. 325, 27 L.Ed. 196. There the United States sought to levy execution against property defined by state law as homestead and exempted by the State from execution. This Court held that Revised Statutes s 916, now Rule 69 of the Federal Rules of Civil Procedure, governed, and that the United States' remedies on judgments were limited to those generally provided by state law.  These homestead exemptions vary widely. They result in a diversity of rules in the various States and in a limitation upon the power of the Federal Government to collect which is comparable to the coverture limitation.  The purpose and theory of the two types of limitations are obviously related.

<u>Id.</u> at 354-356 (footnotes omitted).

In this case, the state laws that allow debtors to claim homestead exemptions as to chattel

debt of the type the Government is now seeking to enforce (and which protections cannot be waived

in advance of the time of claiming the exemptions under North Dakota law) are not  mere procedural

rules that frustrate the ability of the Government to realize upon its well-established creditor rights.

Rather, the state laws in question are substantive in nature and are more about defining the scope

of the homestead exemption and what the relative priorities should be between the Government and

the debtor in terms of the application of homestead exemption in this case.  As the Supreme Court

in <u>Yazell</u> observed, federal law has consistently looked to state law as providing the governing rules

with respect to matters such as this, beginning with the earliest federal judicial acts and then later

Fed. R. Civ. P. 69.  And, more recently, there is nothing in FDCPA that changes this result.

Also, applying state law in this instance would not unduly impede the ability of the Government to carry out its federal farm loan programs and collect upon its debts. If the Government believed it needed additional security for the chattel loans in question, there was nothing prohibiting it from taking a second real estate mortgage and cross-collaterizing the debt at the time the loan was made - a well-recognized commercial practice. Moreover, at the time the real estate mortgage was taken in this case, FmHA tailored its lending practices to deal with individual state laws, e.g., Kimbell Foods, 440 U.S. 730-731, and FSA (the successor agency to FmHA) still does so today , a least to a degree, by the issuance of state supplements with respect to certain of its lending practices and mortgage forms. See, e.g., 7 C. F. R. §§ 1927.51(d) and 1927.57(b)(9). In fact the mortgage at issue in this case is entitled "Real Estate Mortgage for North Dakota" and is identified as "Form FmHA 427-1 ND."

Consequently, based upon the Kimbell Foods, Yazell, and Fink v. O'Neil line of cases, it appears that the Government has agreed to be bound by state law in terms of whether the state homestead exemption can be the subject of an advance waiver, particularly since FDCPA does not now provide differently. Cf. In re Hodes, 402 F.3d 1005, 1009 (10th Cir. 2005) (noting that federal bankruptcy courts look to state law to determine the validity of a state exemptions).

However, even if state law does not apply in terms of whether the homestead protection can be waived in advance, the result would likely be no different if federal common law is applied. In this case, the Government's proffered construction of the mortgage runs contrary to the countervailing policy established by Congress that state homestead protections should extend to debt that is not expressly secured by the real estate as reflected in its approval of Fed. R. Civ. P. 69 and its enactment of the FDCPA. Or, to put it more simply, Congress has decided that, for public policy

reasons, the interests of debtors trump those of federal lending agencies in this narrow area and that state homestead exemptions can be asserted with respect to debt that is not secured by the real estate.[17]

Federal common law, like North Dakota law, provides that statutory protections can be waived, except in those instances in which waivers (and particularly advance waivers) are against public policy.  See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 n.19 (1985); Kristian v. Comcast Corp., 446 F.3d 25, 47 -48 (1st Cir. 2006); Tompkins v. United Healthcare of New England, Inc., 203 F.3d 90, 97 -98 (1st Cir. 2000).  In this case, given the importance attached to the policies of allowing state exemptions from process in both federal debt collection law and federal bankruptcy law, this is one of those instances in which the protections afforded by statute cannot be waived in advance of the time for asserting the statutory rights.  See id. In fact, Congress has by statute made waivers of exemptions in favor of unsecured creditors unenforceable in bankruptcy under 11 U.S.C. § 522(e).  E.g.,  In re Musser, 24 B.R. 913, 917 (W.D. Vir. 1982) (homestead waiver in hospital bill that the hospital claimed amounted to an equitable lien held to be unenforceable);  In re Gilman, 31 B.R. 930 (Bankr. Fla.1983).

### c.    Even if the state law protections could be waived, the waiver was ineffective

Finally, even if the right to claim homestead protections with respect to debt that is not secured by a mortgage can be waived, there is still another problem with regard to whether the purported waiver is enforceable.  Under North Dakota law, any waiver of statutory rights that is not

---

[17]  Just to be clear, we are not taking here about waivers of state homestead laws that impede the ability of a federal lender to enforce mortgage rights with respect to debt for which the mortgage is given.  A waiver in this instance may very well be effective given the differing public policies involved and federal law may trump state law in this situation, anyway.

prohibited by public policy must, nonetheless, be shown to be voluntary and intentional.  See e.g., Lawrence v. Delkamp, 2006 ND 257, ¶ 8, 725 N.W.2d 211. In this case, there is not sufficient evidence that the purported waiver by Neff was intentional.  Given the vagueness of the mortgage language relied upon by the Government and the fact it can reasonably be construed as not waiving the homestead right, an intentional waiver cannot be inferred from the mere language alone. Morever, the result is no different if federal law applies as to what must be shown to constitute the requisite waiver since federal law is not materially different in terms of what is required to waive statutorily protected rights. Cf. Metropolitan Edison Co. v. N.L.R.B., 460 U.S. 693, 706-708 (1983) (waiver of rights under the NLRA must be clear and unmistakable and a waiver will not be implied from contract language that is equivocal); Jardines Bacata, Ltd. v. Diaz-Marquez, 878 F.2d 1555, 1559 -1560 (1st Cir. 1989) (intention to waive must be unequivocal).

**5.     The Government has not come forward with authority that is persuasive for its interpretation**

The only case that the Government cites in support of its interpretation is United States v. E.W. Savage & Son Inc., 343 F. Supp. 123 (D.S.D. 1972).  In Savage, a rancher borrowed $26,000 from the FmHA and executed a promissory note listing 127 head of cattle as security. The rancher then proceeded to sell some of the cattle at auction. One sale was approved by the FmHA supervisor but a large number of sales were not approved.  The defendant livestock commission agents for the unapproved sales paid the proceeds of the sales to the rancher who failed to use the money to repay the FmHA.  Id. at 124-125.  The Government sued the livestock commission agents to recover its losses. Under South Dakota law the livestock commission agents were agents of the seller and personally liable for assisting the rancher in converting the property. The livestock commission agents argued they should be relieved of this liability because the FmHA had consented to the sale.

36

Id. at 125-26.  The Court found, however, that the FmHA had not consented to the sale. Id. at 127.

The livestock commission agents also argued that a secondary real estate mortgage taken was substitute security for the chattel mortgage and therefore the Government had suffered no loss. However, the court concluded there was no evidence the parties understood the real estate mortgage to be substitute security. Id. at 127.  The real estate mortgage in Savage contained language very similar to the language from paragraph 18 of the real estate mortgage in this case. The Court noted that this language indicated that the real estate mortgage was additional security rather than substitute security. Id. at 127.  The case was appealed but the appeal did not address the "additional security" issue.  United States v. E.W. Savage & Son Inc., 475 F.2d 305 (8th Cir. 1975).

The Savage case gives very little analysis to the language cited by the Government and cites no case law in support of its interpretation.  Further, no mention is made in the case regarding homestead rights or the waiver of homestead rights, and there was no issue of surplus proceeds from a foreclosure sale.  In other words, the court in Savage did not analyze whether the so-called "additional security" was subject to a claim of homestead exemption.  The case simply is not persuasive.

## III.   CONCLUSION AND RECOMMENDATION

Based on the foregoing, it is hereby **RECOMMENDED** that:

1.  Smith Bakke Porsborg & Schweigert be paid the proceeds from the sale of Lot 4 or $21,926.92.

2.  Wilbert Neff be granted a homestead exemption and paid $79,727.79.

## <u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within ten

(10) days after being served with a copy of this Report and Recommendation.

Dated this 22nd day of February, 2007.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge